Filed 5/6/22  Waring Plaza Properties, L.P. v. Ross Dress for Less, Inc. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| WARING PLAZA PROPERTIES, L.P., | |
| Plaintiff, Cross-defendant and Respondent, | E074789, E076310 |
| v. | (Super.Ct.No. PSC1500485) |
| ROSS DRESS FOR LESS, INC., | OPINION |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Kira L. Klatchko, Judge.  Reversed.

Buchalter, Glenn P. Zwang, Valerie Bantner Peo and Robert M. Dato for Defendant, Cross-complainant and Appellant.

Manatt, Phelps & Phillips, Benjamin G. Shatz; Levine & Maybaum and Jerid R. Maybaum for Plaintiff, Cross-defendant and Respondent.

Defendant and appellant Ross Dress for Less, Inc. (Ross) appeals the judgment entered by the trial court in which it ordered Ross to pay back rent, interest and attorney

1

fees to plaintiff and respondent Waring Plaza Properties, LP. (Waring Plaza).[1] In 1992, Ross rented a space in the Fred Waring Plaza (Plaza), a Palm Desert shopping center, with DSL Service Company (DSL). Ross signed a lease with DSL, which had several option periods to extend the lease (Lease). Pursuant to the terms of the Lease, DSL represented that the shopping center was to have an anchor tenant, which, in 1992, was a Mervyns store. Charles Amash purchased the Plaza in 1993. Charles[2] transferred ownership to Waring Plaza.

In 2008, Mervyns closed and Ross, claiming a right under the terms of the Lease, reduced the amount of rent it was paying to Waring Plaza to an amount equal to two percent of its gross monthly sales, which Ross identified as "Substitute Rent." Ross paid this Substitute Rent for 10 years and Waring Plaza accepted it. Ross exercised several options to extend the Lease while paying the Substitute Rent. At times during this period, Waring Plaza asserted that Ross owed "Minimum Rent" as defined in the Lease but did not take any action to collect additional rent.

In 2015, Waring Plaza filed suit against Ross, alleging that the payment of the two percent of monthly gross sales was an unenforceable penalty as it did not properly address the loss to Ross from the Mervyns closure. In its third amended complaint, Waring Plaza insisted that the language in the Lease, specifically section 7.2(b), did not

---

[1] We consolidated the two appeals in case Nos. E074789 and E076310. Case No. E076310 involves the judgments entered for attorney's fees and cost after the entry of judgment in case No. E074789.

[2] We refer to Charles Amash as Charles not out of disrespect but due to the fact his daughter who shares his same last name, testified as will be set forth, post.

2

state that two percent of gross monthly sales was the proper payment and was unenforceable. The trial was heard in two phases. In Phase I, a bench trial was conducted to determine the meaning of Section 7.2(b) in the Lease regarding reducing rent when an anchor tenant is no longer in business, identified as a "Reduced Occupancy Period" (ROP). The trial court found Section 7.2(b) unenforceable and excised it from the Lease. The trial court concluded that Ross owed Minimum Rent to Waring Plaza as that term was defined in the Lease. Phase II was a jury trial on breach of contract on the complaint filed by Waring Plaza, and the cross-complaint filed by Ross that Waring Plaza had breached the Lease by failing to replace Mervyns with a comparable tenant. After several determinative rulings, the trial court entered a directed verdict dismissing the cross-complaint and finding that Ross had breached the Lease by failing to pay Minimum Rent. The trial court awarded Waring Plaza back rent, interest and attorney's fees and costs.

On appeal, Ross makes several contentions that the trial court erred during Phase I of the trial. Ross contends (1) the trial court erred by excising Section 7.2(b) from the Lease; (2) Waring Plaza did not prove that Section 7.2(b) was an unenforceable penalty; (3) the trial court erred by refusing to reform the Lease to conform to the intent of the parties; and (4) the trial court erred by refusing to determine whether Waring Plaza was estopped from demanding that Ross pay the Minimum Rent based on Waring Plaza accepting the Substitute Rent for 10 years and twice renewing the Lease despite Waring Plaza's allegation that Ross was in default on the Lease. Ross also claims as to Phase II of the trial as follows: (5) the trial court erroneously eliminated Ross's defenses at the

jury trial; (6) Ross's damages evidence sought to be admitted at the jury trial was improperly excluded; and (7) the trial court erred by awarding Waring Plaza interest on the back rental payments.

## FACTUAL AND PROCEDURAL HISTORY

### A.     ORIGINAL AND FIRST AMENDED COMPLAINTS

The original complaint was filed by Waring Plaza on January 29, 2015.  It alleged causes of action for breach of contract, financial elder abuse and declaratory relief.[3] Waring Plaza alleged that the Lease was entered into on or about February 13, 1992, between Ross and DSL for space in the Plaza.

For the breach of contract action, Waring Plaza alleged that the Minimum Rent was set forth in Section 1.7 of the Lease.  Further, the parties agreed to increased rents during any option period in a first amended lease executed on April 30, 1993, between Charles, the owner of Waring Plaza, and Ross.  The Lease provided there would be an anchor tenant operating at the Plaza, which was a Mervyns store, and that the anchor tenant would occupy a minimum amount of square footage.  If the anchor tenant moved out, the Lease provided for a ROP in section 7.2(b) of the Lease.  During the ROP, Ross would pay either the Minimum Rent or Percentage Rent, as defined in the Lease.

Waring Plaza alleged that the Lease terms in relation to the ROP, allowing Ross to pay the lesser of Minimum Rent or Percentage Rent, was an unreasonable penalty because it was not related to any loss or damage that Ross may suffer.  Ross had the

---

[3] The elder abuse cause of action was later dismissed and is not relevant here.

4

option of terminating the lease after 12 months of ROP but it chose to stay. Ross had been paying less than the Minimum Rent since 2008.

Waring Plaza further alleged that a PGA Tour Superstore (PGA) which took over a portion of the store vacated by Mervyns, was a comparable anchor tenant requiring Ross to pay Minimum Rent. Waring Plaza alleged it had performed all of its obligations under the Lease. Waring Plaza had lost in excess of $1,297,000 plus interest.

For the cause of action for declaratory relief, Waring Plaza alleged that the Lease contained an unreasonable penalty and unenforceable term for ROP. The ROP provision provided unjust enrichment to Ross while there was no comparable anchor tenant. Waring Plaza sought a judicial determination of its rights and duties under the Lease and first amended lease. It demanded a jury trial.

Waring Plaza filed a first amended complaint on May 20, 2015. It clarified that Ross had originally signed the Lease with DSL. Charles purchased the Plaza and a first amended lease was entered into between him and Ross. Charles then formed Waring Plaza. Charles died in 2014. Waring Plaza alleged that in the event of ROP, the Lease provided for the payment of "the lesser of the Minimum Rent/monthly rent or Percentage Rent (2 percent of the monthly gross sales for the Ross store)." In 2008, Ross started paying what it called Substitute Rent, which was two percent of the monthly gross sales for Ross. Waring Plaza alleged the Minimum Rent was approximately $25,000 to $28,000 per month and the rent being paid by Ross was approximately $8,000 to $10,000 per month based on gross sales. The Lease was renewed by Ross in 2013 and expired on January 31, 2018. Under the third cause of action, Waring Plaza sought a judicial

5

determination whether PGA was a comparable anchor tenant to Mervyns. Waring Plaza also filed a second amended complaint on August 25, 2015. Waring Plaza again referred to Percentage Rent as "2 percent of the gross monthly sales for the Ross store."

B. THIRD AMENDED COMPLAINT AND CROSS-COMPLAINT

Waring Plaza filed its Third Amended Complaint alleging breach of contract, financial elder abuse and declaratory relief (TAC). For its first cause of action for breach of contract, Waring Plaza referred to Section 7.2 of the Lease entitled "Cotenancy." Section 7.2(a) provided: "Landlord covenants and represents to Tenant that the cotenant named in Section 1.8 (or a comparable replacement tenant) shall be open in the Shopping Center at commencement of the Term, operating in at least the amount of square footage specified in Section 1.8, and shall continuously throughout the Term operate in such premises. Further, Landlord covenants and represents to Tenant that at commencement of the Term and thereafter throughout the Term at least seventy percent (70%) of the Leasable Floor Area of the Shopping Center (the Store shall be excluded from the numerator and denominator of the fraction used to calculate such percentage) shall be leased to bona fide lessees operating under leases of a minimum of three (3) years' duration open and conducting retail business within the Shopping Center. Anytime at commencement or during the Term when the above-referenced standards in this Section 7.2(a) are not met is hereinafter referred to as a "Reduced Occupancy Period."

Section 7.2(b) provided as follows: "If a Reduced Occupancy Period occurs or is in effect at commencement of the Term or, if a Reduced Occupancy Period occurs at any time following commencement of the Term, Tenant's total obligation for Minimum Rent

6

and Percentage Rent shall be to pay within ten (10) days after the close of each calendar month the lesser of (i) Minimum Rent as provided in Section 7.1 hereof, or (ii) Percentage Rent upon the terms and conditions stated in Sections 8.1 and 8.2 hereof, adjusted on an annual basis, except that any rent paid which is applicable to the Reduced Occupancy Period shall be classified as "Minimum Rent" for purposes of computing the sum of Percentage Rent due in any given Lease Year under the provisions of Section 8.1. If the Reduced Occupancy Period continues for a period of twelve (12) consecutive months, Tenant may, at its option, terminate this Lease upon thirty (30) days' notice to Landlord given at any time within three (3) months after the twelfth (12th) month of the Reduced Occupancy Period."

Article 8 of the Lease was entitled "Percentage Rent." Section 8.1, subdivision (a) provided, "Tenant shall pay to Landlord as additional rent for each Lease Year during the Term which contains twelve (12) calendar months, a sum equal to two percent (2%) of the amount by which Tenant's Gross Sales made during each Lease Year exceeds the "Breakpoint" (as herein defined) for such Lease Year. The amount of such excess is hereafter referred to as "**Percentage Rent**." The Breakpoints shall be as follows: . . ." Gross Sales was defined in Section 2.1(g) and Breakpoints were contained in another section of the Lease and increased in the first amended lease.

Waring Plaza alleged the Lease terms relating to rent during a ROP were an unreasonable penalty and were unenforceable. They were not related to any loss or damage that Ross may actually suffer during a ROP. Waring Plaza alleged Ross had unpaid rent totaling 1.3 million dollars.

7

For the third cause of action, declaratory relief, Waring Plaza alleged that the Lease terms relating to ROP and allowing Ross the choice between paying Minimum Rent or Percentage Rent was an unreasonable penalty. There was unjust enrichment to Ross as it only had to pay if the Breakpoint was reached. Further, it sought a declaration that PGA was a comparable tenant to Mervyns.

Ross filed its first amended cross-complaint on March 2, 2017. Ross alleged that the ROP was defined in the Lease. During that period, the monthly rent was the lesser of Minimum Rent or two percent of Ross's gross monthly sales. Ross engaged in extensive negotiations on the terms and conditions in the Lease. The potential harm to Ross at the time of the negotiation of the Lease for ROP was not reasonably foreseeable. In November 2008, Ross began paying the Substitute Rent. Ross alleged PGA was not a comparable tenant as shoppers were much different from Mervyns shoppers.

Ross's first cause of action was for declaratory relief. Ross alleged that the payment of Substitute Rent was based on the enforceable Lease terms. Further, it sought a finding that PGA was not a comparable tenant. Ross's second cause of action was for breach of contract if the terms regarding ROP rent were found unenforceable. Waring Plaza was in breach for failing to have an anchor tenant since 2008 to replace Mervyns. The third cause of action was for reformation. Ross continued the Lease with the understanding that the Substitute Rent it was paying was proper. If it was found not to be the proper rent, then Ross should have the option to terminate the Lease or pay a fair market rental for the property. The fourth cause of action in the cross-complaint was

8

rescission.  If the Substitute Rent was deemed an improper amount, Ross should be able to terminate the Lease.

The trial court denied Ross's motion for summary judgment finding that there was a triable issue of fact as to the enforceability of the Lease terms.

### C.        MOTION TO BIFURCATE TRIAL

Waring Plaza brought a motion to bifurcate trial on February 15, 2019.  Waring Plaza proposed a first phase trial "deciding the threshold issue of the enforceability of the cotenancy rent reduction in the parties Lease's Section 7.2(b)" and then a second trial on the remaining issues.  Waring Plaza framed the arguments of the parties.  Waring Plaza was arguing that Section 7.2(b) constituted an unenforceable penalty because based on the language in the Lease, during the ROP, Ross's monthly rental obligation was zero because the store never exceeded the Breakpoints.  Waring Plaza insisted that the plain language of Section 7.2(b) showed that the rent to be paid during the ROP was the Percentage Rent.  The Breakpoint was set in in the first amended lease and had never been met during the Lease period.  If Section 7.2(b) was found unenforceable, the only remaining issue would be calculation of damages.

Ross filed opposition to the motion to bifurcate.  Ross argued granting bifurcation would simply require Ross to put on its case twice.  Even if Section 7.2(b) was found unenforceable, there would have to be a trial on damages.  Ross had been paying two percent of its monthly gross sales to Waring Plaza for 10 years and it had been accepted.  Ross insisted a ROP began when Mervyns moved out.  Further, PGA did not occupy the same amount of space as Mervyns and did not provide for cross-shopping.  The amount

9

of rent owed was not zero.  At trial, Ross sought to introduce extrinsic evidence regarding the negotiation of the Lease terms, including the cotenancy provision.  The same witnesses would also testify regarding whether PGA was comparable to Mervyns.  The motion to bifurcate was granted.

D.    PHASE I BENCH TRIAL

Ross filed a list of claims and defenses for the Phase I trial.  Ross sought declaratory relief that while Mervyns or a comparable replacement were not operating a ROP, Ross would pay Minimum Rent or two percent of monthly gross sales, whichever was the lesser.  Ross also sought to reform the Lease or have the option to cancel the Lease.  In the cross-complaint, Ross sought breach of the Lease for failure to provide a Mervyns or comparable tenant.  Ross raised several defenses including statute of limitations, estoppel for Waring Plaza taking Substitute Rent for 10 years, and laches.  It argued as to estoppel that Waring Plaza accepted rent in the amount of two percent of monthly gross sales for several years.  Waring Plaza waited to file its complaint until Ross could no longer terminate the Lease.  Ross had exercised two options to extend the Lease based on its ability to pay Substitute Rent.

Waring Plaza also submitted its claims and defenses.  Ross owed Minimum Rent pursuant to the terms of the Lease.  Ross had been paying the Substitute Rent, but there was nothing in the Lease that allowed for this payment.  Waring Plaza insisted that Ross had to pay the Minimum Rent or Percentage Rent.  The Percentage Rent amount would be zero under the terms of the Lease so it was unenforceable.  Ross should have been

10

paying the Minimum Rent under Section 1.7 of the first amended lease. Further, PGA was a comparable tenant to Mervyns.

The parties stipulated to the following facts for Phase I of the trial. In 1992, DSL and Ross entered into the Lease. The Lease was eventually transferred to Waring Plaza and a first amended lease was entered into. Ross paid Minimum Rent as defined in the Lease from the inception of the Lease until November 29, 2008. From November 29, 2008, until the bench trial, Ross had paid two percent of gross monthly sales. Ross renewed the Lease four times including on June 6, 2017. The Lease would expire on January 31, 2023. Ross did not exercise any right to terminate the Lease under Section 7.2(b) and such right had expired. Ross's annual sales had never exceeded the Breakpoint as defined in Section 8.1 of the Lease. The parties stipulated to the authenticity of the Lease and the first amended lease.

Gregg McGillis testified at the Phase I trial. He was a senior vice president for Ross. At the time of the negotiation of the Lease, Ross was a sophisticated party familiar with retail lease negotiations. Outside legal counsel for Ross drafted the original Lease. The initial draft of the Lease was a standard lease form. Changes were made through agreement of the parties to the initial proffered standard lease. McGillis had no involvement in the negotiation or signing of the Lease or the first amended lease.

At the time that the Lease was negotiated, Ross did not conduct any studies to determine the impact that closing of the Mervyns store would have on Ross's profits. In July 1992, DSL sent a letter to Ross expressing that there may be problems with the wording in Section 7.2 in regards to the percentage of tenants who had to occupy the

11

Plaza in order for it to be considered a ROP. Ross did not want to change it and it was not changed in the first amended lease. In 2017, Ross chose to exercise its option to extend the Lease even though Waring Plaza had filed the instant lawsuit. Ross also did not terminate the Lease after Mervyns closed even though it had such right under the Lease. McGillis acknowledge that Section 7.2(b) of the lease did not contain the term Substitute Rent. It did have a defined term for Percentage Rent. The minimum rent at the time the lawsuit was filed was $33,530.75.

In 2010 and 2012, Ross offered to amend the Lease to reduce the Minimum Rent amount and delete the cotenancy provision in Section 7.2(b). No amendment to the Lease was agreed upon. On December 18, 2009, Charles sent an email to Ross. Charles noted that it had been a year since the Mervyns Store had closed. He stated, "I was penalized a great amount of money, never the less, we have to go back to the normal lease amount of $25,910.12" Charles hoped Ross would stay as tenants. In January 2010, Ross proposed that it pay a reduced amount of Minimum Rent for the period of March 2010 to January 2013. Rosalinda Amash[4] countered that Waring Plaza would extend the Lease until 2023 based on the Minimum Rent already provided for in the Lease and the first amended lease. No agreement was reached and Ross continued to pay the two percent of monthly gross sales. Charles sent an email on March 18, 2010, to Ross that it had to pay the Minimum Rent of $25,910.12.

---

[4] Rosalinda Amash was Charles's daughter; she took over after Charlese died in 2014. We refer to her by her first name for ease of reference; no disrespect is intended.

Ross requested to exercise the option extending the Lease from 2013 to 2018. Charles and Rosalinda wanted Ross to expressly agree that it would pay the Minimum Rent for that option period, which was $28,450.33. Charles requested in December 2012 that Ross pay $808,000 in back rent. Ross sent a letter on July 11, 2012, indicating it would agree to pay Minimum Rent or Percentage Rent, whichever was lower, as long as a comparable tenant was not in the Mervyns space. The Lease was extended with no agreement. Ross continued to pay two percent of gross monthly sales.

A 10-day notice to pay or quit was sent to Ross on October 22, 2014, asking for Ross to pay the monthly rent of $28,450.33 for October plus late fees. Ross did not pay it. Another 10-day notice was sent in November 2014 seeking only payment of the November rent. Waring Plaza never pursued the notices by filing an eviction.

When Ross paid the rent after Mervyns vacated the Plaza, it would send an accounting showing that it was paying two percent of gross sales for the month, which Ross initially identified as Percentage Rent, but later identified it as Substitute Rent. McGillis agreed that the term Substitute Rent was not in the Lease.

The trial court initially did not allow McGillis to testify to language that predated the Lease to challenge the actual language in the Lease. Counsel for Ross explained the evidence was relevant to reformation. The trial court agreed to provisionally allow the testimony.

McGillis testified that in 1990, DSL reached out to Ross to see if it was interested in renting in the Plaza, which was being developed. When drafting the Lease, there were negotiations back and forth about the terms of the Lease. Both parties had legal counsel.

13

Ross considered DSL to be a sophisticated party. McGillis would have anticipated when negotiating the Lease that losing Mervyns would have a negative impact on sales but it was very difficult to quantify. McGillis was certain the Lease would not have been entered into by Ross if a ROP rent was not included.

McGillis also testified that in deciding to rent in a shopping center, Ross relied on the identity of the cotenant to determine how much it wanted to pay in rent and whether it was a high quality shopping center. A ROP provision was usually included in Ross's shopping center leases.

No one at Waring Plaza ever asked Ross what it meant by Substitute Rent when it paid it. McGillis had recommended extending the Lease in 2012 and 2017 based on paying the ROP rent and would not have extended if Ross owed Minimum Rent.

Waring Plaza called Rosalinda. Waring Plaza owned only Ross and another store in the Plaza. Waring Plaza had no ability to get a tenant into the Mervyns property because it did not own the property. Rosalinda was not involved in the signing or negotiation of the Lease. Rosalinda had not entered into any oral or written modifications of the Lease with Ross. Rosalinda sued Ross after Charles died.

Robin Walker-Gibbons worked as a shopping center lease specialist for a developer. She was offered by Ross as an expert in shopping center development and leasing. She testified that a developer of a shopping center wanted to attract many customers and have high sales. The developer of a shopping center first got an anchor tenant and then added other retailers. She explained that the minimum rent in a lease was the base amount the tenant agreed to pay if certain obligations were met by the landlord.

14

Percentage Rent was considered overage rent or bonus rent. It could also be the formula used for ROP. It was usually just a percentage of gross sales. This was usually referred to as cotenancy rent. She also heard it called substitute rent. She had never seen a lease where the rent for the ROP was attached to a breakpoint.

At the conclusion of the above evidence, Ross sought to admit extrinsic evidence to show there was a mistake in the Lease and that it did not express the intent of the parties. Ross insisted the Lease needed to be reformed on the grounds of mistake. The trial court kept out any extrinsic evidence to show an ambiguity in the Lease. The trial court believed it was a written integrated agreement and all prior negotiations were not relevant. Ross argued that the integration clause was limited; it did not cover mistake. Ross contended that the Lease did not reflect what the parties intended and sought reformation of the Lease. Ross argued that section 7.2(b) of the Lease was ambiguous. Ross had evidence to show what was intended by the parties at the time the Lease was signed as to monthly rent during the ROP. Ross insisted the ROP could be interpreted in two ways. Ross also argued there was a mutual mistake of the lawyers as to the final Lease. The trial court did not allow presentation of extrinsic evidence.

Waring Plaza argued there was no ambiguity in the Lease terms. Section 7.2(b) provided that during ROP, the rent to be paid was Percentage Rent, which was a percentage after the Breakpoint. Ross stipulated the Breakpoint was never met. As such, under the Lease, during ROP, Waring Plaza would be entitled to zero rent. By definition this was an unenforceable penalty. There was no evidence when the Lease was signed as to what the parties anticipated the harm would be to Ross if the Mervyns store closed.

15

Further, Waring Plaza repeatedly and consistently demanded that Ross pay minimum rent when it was paying Substitute Rent. There was no evidence of mistake or drafting error. Further, reformation and recission were clearly time barred as Ross was put on notice of potential problems with Section 7.2(b) in 1992.

Waring Plaza insisted section 7.2(b) was an unenforceable penalty; it should be excised from the Lease and Ross would owe Minimum Rent for the entire period of the Lease. Waring Plaza argued section 7.2(b) was "an unenforceable penalty that was not based on any real or anticipated harm at the time of" the inception of the Lease.

Ross argued it chose to stay and extend the Lease in reliance on being able to pay Substitute Rent. Waring Plaza was estopped from complaining about the payment of Substitute Rent. Ross further argued the decision to exercise the option on the Lease was based on paying Substitute Rent.

Waring Plaza also argued the Lease contained a latent ambiguity because Section 7.2(b) referred to "monthly rent" and Section 8.1 was based on "yearly" Breakpoints. It was absurd to apply an annual Breakpoint to a monthly rent. The ROP rent and the Breakpoint rent could not be the same thing. Waring Plaza argued Ross could not rely on estoppel because it was informed repeatedly to pay Minimum Rent. Waring Plaza insisted it could accept the Substitute Rent and then seek the remainder by filing a lawsuit.

E.    TENTATIVE DECISION ISSUED AFTER PHASE I TRIAL

The trial court issued a tentative decision after Phase I. The trial court noted that it had only addressed in the bench trial whether Section 7.2(b) was unenforceable, and if so,

16

whether reformation or rescission was required. The trial court concluded that Section 7.2(b) was unenforceable and the court could not reform or rescind the Lease.

The trial court determined that the Lease was a standard form lease prepared by Ross. It included definitions of Minimum Rent, Percentage Rent, and Lease Years. The court recited Sections 7.2(a) and 7.2(b). Further, it also recited Section 8.1 defining Percentage Rent. It also referred to the Breakpoint, which started at 8 million dollars each year and increased each option period to renew the Lease. The first amended lease did not amend any of these above provisions. Ross did not pay Percentage Rent as defined in the Lease after Mervyns moved out but paid Substitute Rent, which was two percent of monthly gross sales.

In December 2009, Charles reached out to Ross that it needed to pay the Minimum Rent. In 2010, they discussed removing the cotenancy provision and negotiating a lower minimum rent. Ross continued to pay Substitute Rent. Further negotiations to remove the cotenancy clause were discussed in 2012. Charles died in 2014. In October 2014, Waring Plaza advised Ross it was in breach of the Lease for failing to pay rent.

The trial court noted that whether a contractual provision was an unenforceable penalty was decided by the court and not a jury. It looked first to the Lease terms. It was undisputed that Ross had to pay Minimum Rent pursuant to sections 1.7 and 7.1. The ROP rent was clearly either Minimum Rent or Percentage Rent. Waring Plaza asserted that the Breakpoint was never reached so the rent calculated under the Lease was zero. The court noted, "Ross asserts, however, that the language at issue is so ambiguous that it cannot be interpreted as Waring Plaza urges. The Court agrees that the language is

17

ambiguous." The trial court specifically found that Section 8.1 provided for a bonus to Waring Plaza in addition to Minimum Rent if Ross exceeded the Breakpoint. It also penalized Waring Plaza during ROP under Section 7.2(b). The trial court noted, "It is difficult to reconcile the penalty function of Section 7.2, subdivision (b), with the incentive function of Section 8.1." In order to reconcile, "one would have to assume that at the time they drafted the Lease, the parties believed simultaneously that the loss of a Cotenant would have a negative impact on Ross sales such that it warranted a significant reduction in monthly rent, and that the loss of a Cotenant would not prevent Ross from vastly exceeding the negotiated Breakpoints such that the Landlord would still generate some income by accepting Percentage Rent instead of Minimum Rent." The trial court noted that the parties stipulated Ross had never exceeded its Breakpoint. As such, "under the Lease so construed Ross would owe $0 Minimum Rent or Percentage Rent during any [ROP]." The trial court found this would create the absurd result that Waring Plaza had to continue renting to Ross over the Lease term for zero rent. Further, Section 7.2(b) would be unenforceable because it was not tied to any damages that Ross suffered as a result of Mervyns leaving the Plaza. It further found, "That said, the language at issue it too ambiguous for the Court to conclude that the parties intended that absurd and unlawful result."

The trial court also found an ambiguity in the time for payment of rent. It found there was no way to give effect to the cotenancy provision of the Lease without examining parole or extrinsic evidence to resolve the ambiguities. However, the Lease was an integrated written agreement. It referred to Section 37.14 of the Lease. Since it

18

was a fully integrated agreement, the Lease and the first amended lease must be interpreted by reference only to parole or extrinsic evidence that explains the meaning of the terms used in the Lease. There was no evidence offered by either party as to the meaning of the terms in the Lease. All of the extrinsic evidence offered by Ross was how to reform the Lease to include Substitute Rent.

The trial court could not find the contracting parties intent as to Section 7.2(b). It was absurd and needed to be excised. It found that reformation was not appropriate. Ross was arguing a "scrivener's error" in that Section 7.2(b) was improperly drafted and was not the agreement. The trial court found that "the statute of limitations on Ross' reformation and rescission causes of action expired decades before the instant litigation was filed." The evidence at trial showed that Ross was aware of the mistake six months after signing the Lease. Further, there was no clear and convincing evidence of an intent for Substitute Rent at two percent of monthly gross sales. There was no evidence offered that the parties reached a definitive agreement on Section 7.2(b) as stated by Ross even though the parties discussed it during negotiations. In fact, there was a response by DSL that the cotenancy provision was unacceptable.

The trial court concluded, "Waring Plaza is entitled to a declaration that Lease Section 7.2, subdivision (b) is unenforceable, as prayed for in its Third Cause of Action in its Third Amended Complaint. Ross is not entitled to a declaration as prayed for in its First Amended Cross-Complaint, nor is it entitled to Reformation as pleaded in its Third Cause of Action, or to Rescission as pleaded in its Fourth Cause of Action."

19

A hearing was held on April 29, 2019.  Ross indicated a jury trial on damages was necessary.  Ross requested a statement of decision.  Ross wanted a decision to address, among other things, whether Waring Plaza's claims were barred by the doctrine of estoppel.  Waring Plaza filed a response that a statement of decision was not warranted because the trial took less than eight hours.  Waring Plaza also argued the tentative decision could serve as the statement of decision.  The trial court could add "the nonjury fact issue of estoppel" to the tentative ruling.  The trial court reserved on issuing a statement of decision after all the issues had been tried.

F.      PHASE II JURY TRIAL

Waring Plaza filed a trial brief.  It argued the only issues for the Phase II trial were its breach of contract claims for damages.  The trial court already found that regardless of a ROP, Ross had to pay Minimum Rent, so any further trial on Ross's damages was not necessary.  Waring Plaza admitted it was only entitled to damages starting in 2011.

Ross also filed a trial brief.  Ross contested that it owed Minimum Rent as this was against the intent of the parties when signing the Lease and the actions of the parties over the prior 10 years.  In addition, industry practice provided for reduced rents during ROP.  Ross further contended that Waring Plaza accepted the Substitute Rent starting in 2008 without taking any legal action.  Ross relied on paying the Substitute Rent when it decided not to terminate the Lease in 2010, and when it renewed the Lease in 2012 and 2017.  As such, principles of estoppel barred Waring Plaza's breach of contract claim.  Further, Ross argued that an additional issue for the jury was whether the parties had an

20

implied in fact amendment to the Lease. Ross argued that any recovery was limited by the statute of limitations to beginning in January 2011.

The Phase II jury trial began on July 23, 2019. The Phase II evidence consisted of the testimony of Rosalinda that Ross had been paying Minimum Rent under the Lease and first amended lease until November 29, 2008, when Mervyns closed. The Minimum Rent at that time was $25,910.12 per month. Ross had the option to terminate the Lease after Mervyns vacated but chose to extend the Lease. The Minimum Rent increased each time the Lease was extended.

Rosalinda indicated that Ross was to pay the Minimum Rent by the tenth day of each month. Section 37.1 of the Lease provided for interest to be paid by Ross if late payments were made. Rosalinda and her father both demanded that Ross pay the Minimum Rent. Rosalinda admitted that Waring Plaza had not filed its lawsuit until 2015 even though Minimum Rent had not been paid since 2008.

In October and November 2014, Waring Plaza sent 10-day notices to quit to Ross for failure to pay Minimum Rent during those months. No other notices were sent to Ross for nonpayment of rent. No lawsuit was filed for unlawful detainer after service of the notices to quit despite Ross continuing to pay Substitute Rent. Charles did not return the lesser payments of rent because he had to pay for the mortgage on the property and needed Ross to stay as a tenant. Waring Plaza provided a chart showing the amounts paid by Ross between 2011 and 2019, the applicable period. It also included the interest that Waring Plaza claimed to be owed by Ross.

21

Ross presented the testimony of David Byrne, a photographer. He took aerial photographs of the Plaza and a shopping center across the street in 2018. Ross wanted to show the differences in the vacancies and the amount of cars in the parking lots.

Ross also presented McGillis as a witness. He explained he was in charge of property development for Ross. He indicated that Ross was an off-price department store that primarily operated in shopping centers. Ross relied on cross-traffic from customers visiting other retailers in the shopping center. An anchor tenant was a large retailer that drew customers to the location. The Lease provided that Mervyns would be a cotenant and that it would occupy 77,400 square feet in the Plaza or a comparable tenant in at least the same square footage. Ross would not have entered into the Lease without this provision. Mervyns was a very desirable anchor tenant, which made Ross think it would be successful. Ross chose to not terminate the Lease when it had the option because there were three years left on the Lease and it wanted to determine the financial impact from the Mervyns closing.

Robin Walker-Gibbons was also called by Ross. She indicated the main thing that a retailer looked for in renting in a shopping center was the strength of the cotenants. Location was also important. An anchor was the largest tenant in the shopping center. In 1992, Mervyns was a good anchor tenant. Typically, other retailers would rely on the anchor tenant in deciding to rent in a shopping center. The trial court did not allow her to testify about the condition of the shopping center as it related to damages as she was not qualified. She also did not know the square footage of PGA in order to calculate if it was a comparable tenant.

22

Ross presented the deposition testimony of Matthew Prater. Prater was the chief financial officer of Golf and Tennis Pro Shop, Inc., which owned PGA. He stated the square footage of the PGA store was 50,012 square feet.

Waring Plaza requested a directed verdict on the cross-complaint because Ross did not present any testimony on damages. Ross argued in response that it had raised defenses that Waring Plaza had not met the material terms of the Lease by not having the required tenant with the correct amount of square footage. The trial court initially denied the directed verdict.

After argument regarding the instructions and verdict forms, the trial court found there was only one question for the jury—whether there was a breach of contract by Ross. Ross noted it had nothing to argue because the parties had already stipulated it did not pay Minimum Rent. The trial court acknowledged that it had concluded there was no evidence of defenses and there was no cross-complaint. The trial court directed the verdict in favor of Waring Plaza for breach and dismissed the jury.

G.    STATEMENT OF DECISION AFTER BENCH AND JURY TRIALS

On October 21, 2019, the trial court filed a proposed statement of decision. It addressed both Phase I and Phase II of trial. For Phase I, the trial court repeated the same findings as the tentative ruling it issued after the Phase I bench trial. It did not add a determination on estoppel. The trial court then addressed Phase II. It recognized that the parties sought a jury trial on their respective breach of contract claims. In pretrial proceedings, Ross argued that the jury should be instructed on breach of oral or implied contract; the parties agreed to the Substitute Rent. However, the trial court already

23

resolved in Phase I that reformation was not allowable. The jury was not allowed to consider oral modifications.

Waring Plaza put on evidence that Ross stopped paying Minimum Rent in November 2008 and paid Substitute Rent. The original complaint was filed in January 2015, and Ross extended the Lease in 2017. Waring Plaza had demanded Minimum Rent and not Substitute Rent prior to filing its lawsuit. Ross presented evidence of PGA only occupying 50,000 square feet. There was no other relevant evidence provided by Ross.

Waring Plaza requested a directed verdict and it was granted by the trial court. The trial court also granted a motion for directed verdict on Ross's affirmative defense of waiver. The directed verdict on all claims was granted and the jury was dismissed.

The trial court found that Ross breached the Lease by failing to pay Minimum Rent. Damages were to be awarded for the time period of February 2011 through July 2019. The trial court awarded damages of $1,859,522.86 in rent, plus $10,349.10 in late penalties, and $719,377.31 in prejudgment interest.

Ross objected to the statement of decision. Among other arguments, Ross complained the trial court never made a determination on the argument of estoppel. On January 17, 2020, the trial court issued a minute order. The parties were not present. The trial court only stated as to the failure to address estoppel that the objection by Ross was "overruled."

Judgment was entered on February 11, 2020. The parties entered into a stipulation to stay the judgment while Ross filed an appeal.

24

Waring Plaza submitted a memorandum of costs on February 19, 2020. It sought total costs of $100,841.07. Ross filed a motion to tax costs. Waring Plaza filed a request for attorney's fees and included all of the bills. Ross filed opposition to the motion for attorney's fees. Waring Plaza filed a reply.

The trial court submitted its ruling on attorney's fees and costs on October 27, 2020, and then amended on December 15, 2020. It granted Waring Plaza $1,613,535.00 in attorney's fees and $15,996.28 in costs. Ross appealed from this finding.

## DISCUSSION

### A.      EXCISING LEASE SECTION 7.2(B)

Ross makes several claims that the trial court erred by excising section 7.2(b) from the Lease. First, it was the trial court's duty to ascertain the intent of the parties and interpret the Lease to conform to their intent. The parties created an ambiguity in the Lease and the conduct of the parties—Waring Plaza accepting Substitute Rent during the ROP—was evidence of the intent of the parties. Further, the trial court could not excise section 7.2(b) from the Lease. The trial court erroneously relied on the severability provision in the Lease to justify excising section 7.2(b).

" ' "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation." ' " (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1145-1146.) " 'Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none

25

exists.' " (*Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1070.)  When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible.  (Civ. Code, § 1639.)

"The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37.)  However, under California's parol evidence rule, " '[w]hen the parties to a written contract have agreed to it as an "integration"—a complete and final embodiment of the terms of an agreement—parol [i.e., extrinsic] evidence cannot be used to add to or vary its terms.' " (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 953.)

Here, the trial court found that the cotenancy[5] provision as it pertained to ROP was an unenforceable penalty as the way the Lease was written, it would result in zero

---

[5]  "Cotenancy requirements are included in retail leases for the benefit of the tenant.  They generally require other stores in the shopping center to be occupied by operating businesses.  [Citation.]  Their purpose is to assure the tenant that 'there is [¶] [a] critical mass of key tenants or occupants as well as a sufficient population of other retailers that have opened for business or will concurrently open when the tenant is required or intends to open; and [¶] [a] satisfactory level of occupancy by these tenants or occupants during the term of the lease after the tenant has opened.'  [Citation.]  Cotenancy provisions usually are found only in retail leases." (*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.* (2015) 232 Cal.App.4th 1332, 1343 (*Grand Prospect*).)

26

rent being paid by Ross during the ROP, which was not connected to any actual loss to Ross.

"[T]he law of California, . . . does not allow unreasonable penalties or forfeitures simply because they are imaginatively drafted as contractual conditions." (*Grand Prospect*, *supra*, 232 Cal.App.4th at p. 1356.) "Under California law, the characteristic feature of a penalty is the lack of a proportional relationship between the forfeiture compelled and the damages or harm that might actually flow from the failure to perform a covenant or satisfy a condition. [Citation.] In other words, an unenforceable penalty 'bears no reasonable relationship to the range of actual damages the parties could have anticipated would flow' from a breach of a covenant or a failure of a condition." (*Id.* at p. 1358; see also *Harbor Island Holdings v. Kim* (2003) 107 Cal.App.4th 790, 797.) "Therefore, the general rule for whether a contractual condition is an unenforceable penalty requires the comparison of (1) the value of the money or property forfeited or transferred to the party protected by the condition to (2) the range of harm or damages anticipated to be caused that party by the failure of the condition. If the forfeiture or transfer bears no reasonable relationship to the range of anticipated harm, the condition will be deemed an unenforceable penalty." (*Grand Prospect*, at p. 1358.)

"Whether a contractual provision is an unenforceable penalty is determined by the trial court, not the jury. [Citation.] As a result, the issue has been described as a question of law. [Citation.] However, the validity of a provision alleged to be an unlawful penalty 'is not really a classic question of law, but is one of fact that, because of its character, is nevertheless committed to judicial determination.' [Citation.] Thus, a trial court decides,

27

in light of all the facts, including the whole instrument, whether the provision in question is an unlawful penalty." (*Grand Prospect*, *supra*, 232 Cal.App.4th at pp. 1354-1355.) "[A] provision's invalidity as a penalty is a question of law subject to de novo review, but the factual foundation for appellate review consists of (1) the facts that are not in dispute and (2) the facts that are established by viewing the conflicting evidence in the light most favorable to the trial court's judgment." (*Id.* at p. 1355.)

Here, the Lease terms provided in section 7.2(b) that during an ROP, Ross would pay the lesser of Minimum Rent or Percentage Rent upon the terms and conditions stated in Sections 8.1 and 8.2. Section 8.1 provided the calculation of Percentage Rent as "Tenant shall pay to Landlord as additional rent for each Lease Year during the Term which contains twelve (12) full calendar months, a sum equal to two percent (2%) of the amount by which Tenant's Gross Sales made during each Lease Year exceeds the 'Breakpoint.' " The parties stipulated that the Breakpoint was never reached. As such, the rent during the ROP, as calculated under the terms of the Lease, was zero.

This provision had no connection to any actual loss by Ross. (*Grand Prospect*, *supra*, 232 Cal.App.4th at pp. 1364-1365 [similar provision in lease allowing Ross to pay zero rent if Mervyns never occupied shopping center found to an unenforceable penalty].) Ross reported that it continued to have sales after Mervyns vacated and Waring Plaza had to continue paying the mortgage on the property. Further, Ross decided to continue in the space because it was economically feasible based on it paying the reduced rent. As such, zero rent for the operative period for the space bore no reasonable relation to the

28

harm caused to Ross. (*Id.* at p. 1358.) As such, the trial court properly determined it was an unenforceable penalty as the terms were written in the Lease.

Upon concluding that the payment of Percentage Rent during the ROP period was an unenforceable penalty, the trial court properly severed section 7.2(b). The Lease provided in section 37.2: "If any term, covenant, condition or restriction of this Lease is held by a Court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby."

Here, the trial court could not consider extrinsic evidence to supplement the terms of the Lease to provide for the Substitute Rent rather than the Percentage Rent. The parties stipulated that Ross never met the Breakpoint so it would owe zero rent. Although Ross contends that Waring Plaza never proved that there was zero rent, the parties stipulate that the Breakpoint was never reached. The integration clause did not allow the trial court to consider any prior agreements or oral discussions while the Lease was being negotiated. It could only consider if the negotiations helped to define the terms in the Lease.

Even considering the extrinsic evidence for this purpose, it is not clear that the parties had an agreement on the two percent of monthly gross sales and there was no evidence of the meaning of the Lease terms. The initial communication from DSL to Ross does not include any term regarding cotenancy. It did provide for Percentage Rent based on a Breakpoint. Ross responded with a proposed cotenancy provision should the

29

occupancy in the Plaza fall below 50 percent or Mervyns was not open, that Ross could choose to pay "substitute minimum rent equal to two percent (2%) of the gross sales" paid monthly. On February 21, 1991, Waring Plaza responded as to the cotenancy provision "Not acceptable." Then on March 7, 1991, Waring Plaza countered with an offer for the cotenancy provision to be—if Mervyns closed or there was less than 30 percent occupancy in the Plaza, Ross could elect to pay two percent of gross monthly sales until a comparable replacement tenant was found. Ross responded on March 19, 1991. It provided separate sections for Percentage Rent and cotenancy. Ross agreed with the counteroffer by Waring Plaza. It provided that if Mervyns closed, Ross could elect to pay two percent of monthly gross sales. On June 20, 1991, Waring Plaza proposed a change to section 7.2 of the proposed lease changing the occupancy in the Plaza from 30 percent to 15 percent. The Lease was signed in February 1992. There was no evidence presented as to the final agreement other than the Lease. Ross presented a letter executed on July 29, 1992, regarding a mistake in the Lease in section 7.2(b) that referred to the total occupancy in the Plaza, but does not address the two percent of gross monthly sales.

None of the extrinsic evidence provided by Ross showed the final agreement reached on the ROP rent. The extrinsic evidence also does not provide that the terms in the executed Lease actually mean something other than what the plain terms of the Lease provide. The extrinsic evidence sought to add the Substitute Rent term to the Lease, which is prohibited for this integrated agreement. As such, even considering the extrinsic evidence, it was not clear what the parties agreed to in the final Lease agreement or if the terms meant something other than Ross paying zero rent. As such, we cannot say that the

trial court erred by determining that the cotenancy provision should be excised from the Lease after concluding it was an unenforceable penalty.

### B. REFORMATION

Moreover, this extrinsic evidence did not support a reformation of the Lease as there was no evidence of a direct agreement about the two percent of *monthly* sales during the ROP.[6]

"Where, through mistake, the contract does not reflect the mutual intention of the parties, 'such intention is to be regarded, and the erroneous parts of the writing disregarded.' [Citation.]  In the case of mutual mistake, the contract may be reformed to conform to the intent of the parties.  [Citation.]  'In determining whether [there has been] a mutual mistake, [the] court may consider parol evidence,' and such evidence may be introduced in the face of an integration clause.  'Extrinsic evidence is necessary because the court must divine the true intentions of the contracting parties and determine whether the written agreement accurately represents those intentions.' " (*Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1243.)  "Basic to a cause of action for reformation is a showing of a ' "definite intention or agreement on which the minds of the parties had met [which] pre-existed [and conflicted with] the instrument in question." ' " (*Appalachian Ins. Co. v. McDonnell Douglas Corp.* (1989) 214 Cal.App.3d 1, 21.)  "In reforming the written agreement, a court may 'transpose[],

_____

[6] We disagree that reformation was barred by the statute of limitations.  Up until the third amended complaint, Waring Plaza also interpreted the Lease to provide for two percent of monthly gross sales during the ROP.

31

reject[], or suppl[y]' words [citation], but has ' "no power to make new contracts for the parties" ' [citation].  Rather, the court may only reform the writing to conform with the mutual understanding of the parties at the time they entered into it, if such an understanding exists." (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524.)

Initially, Ross did not properly plead a cause of action for reformation.  "A complaint for reformation based on mutual mistake must allege 'facts showing how the mistake was made, whose mistake it was, and what brought it about, so that the mutuality may appear.' " (*Komorsky v. Farmers Ins. Exchange* (2019) 33 Cal.App.5th 960, 974.) Here, Ross never stated in its cross-complaint how the mistake occurred.  The trial court could have denied reformation on this basis alone.

Moreover, the evidence presented in favor of reformation did not establish what the parties finally decided as to rent during the ROP.  Although the evidence showed that the parties did discuss the cotenancy agreement, there is no direct evidence as to the final decision as to what would trigger the ROP, or a definitive determination as to what would be paid.  As such, the extrinsic evidence did not establish that the trial court could reform the Lease to comport with the mutual intention of the parties. W e recognize that the Lease as written provides for an unenforceable penalty, but it did not allow the trial court to reform the Lease when no evidence supported what the parties agreed to otherwise.  As written, during the relevant time period of 2011 through 2019, the Lease provided that Ross would pay zero rent during the ROP period, which is an unenforceable penalty.

C.      ESTOPPEL

Ross contends on appeal that the trial court erred by refusing to determine whether Waring Plaza was estopped to demand Minimum Rent by twice renewing the Lease, while Ross continued to pay two percent of monthly gross sales rather than Minimum Rent, and Waring Plaza never took any action against Ross.

The trial court never addressed the fact that Waring Plaza allowed Ross to continue in the property despite paying the Substitute Rent instead of Minimum Rent, and allowed Ross to exercise its option twice to continue the Lease despite not paying Minimum Rent. Although the parties argued estoppel and the trial court was aware that it was an issue raised by Ross, it never made a direct ruling on estoppel. Ross relied on its interpretation of the Lease to allow for a monthly rent payment of two percent of gross sales during the ROP and clearly advised Waring Plaza of its belief. Waring Plaza continued to accept the Substitute Rent without taking any legal action. Further, Waring Plaza allowed Ross to renew the Lease on two separate occasions in 2012 and 2017, despite the Lease providing that no option could be exercised if Ross was in default.

"Broadly speaking, 'estoppel' refers less to a doctrine than to a conceptual pattern, first articulated in the courts of equity, which has come to pervade our law. When it is successfully invoked, the court in effect closes its ears to a point—a fact, argument, claim, or defense—on the ground that to permit its assertion would be intolerably unfair. It is commonly said that the party to be estopped, having conducted himself in manner X, will 'not be heard' to assert Y. (*City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 486.) " 'The doctrine of equitable estoppel is founded on concepts of

33

equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment.' " (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1189.)

"Even if innocent in its own right, the conduct must usually operate to cast a pall of unfairness over the position now asserted. This requires that the predicate conduct somehow caused the party asserting the estoppel to suffer some harm or change of position without which the matter now asserted could or would have been deprived of its damaging potential. Basically, the party to be estopped induced the party asserting estoppel to conduct himself in a manner that unfairly exposes him to the argument, claim, or defense against which the estoppel is sought." (*City of Hollister v. Monterey Ins. Co.*, *supra*, 165 Cal.App.4th at p. 487.) "A[n] accurate description of the elements of equitable estoppel would . . . be: (1) The party to be estopped has engaged in blameworthy or inequitable conduct; (2) that conduct caused or induced the other party to suffer some disadvantage; and (3) equitable considerations warrant the conclusion that the first party should not be permitted to exploit the disadvantage he has thus inflicted upon the second party. (*Id.* at p. 488.) " ' To create an equitable estoppel, "it is enough if the party has been induced to *refrain* from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss." ' " (*Vu v. Prudential Property & Casualty Ins. Co.* (2001) 26 Cal.4th 1142, 1152-1153.)

In *Bettelheim v. Hagstrom Food Stores, Inc.* (1952) 113 Cal.App.2d 873, the defendant leased commercial space from the plaintiff for a specified term. When the term of the lease expired, the defendant remained in the premises for approximately eight months, during which the parties attempted to negotiate a new lease. During the negotiations, the defendant continued to pay rent calculated according to the terms of the expired lease, which the plaintiff accepted without objection. After eight months, negotiations ended without a new lease. At that point, the plaintiff filed suit for additional rent, based on a provision in the old lease that required increased rent during any holdover period after the original term. (*Id.* at pp. 874-876.) The court found that the plaintiff was estopped from enforcing the strict terms of the lease because the "plaintiff accepted said payments with full knowledge of the manner in which they were computed and at no time prior to the filing of this suit raised any question as to the sufficiency or correctness of the amounts of said payments," and induced the tenant to remain in the premises. (*Id.* at pp. 876-877.) It reasoned, the "[p]laintiff received rental for eight months longer than he would have received had he not by his conduct misled [the] defendant into thinking the old rental applied. Apparently [the] plaintiff had no tenant to enter during that period as during it all he was endeavoring to get [the] defendant to remain. On the other hand, to apply the penalty would be to inflict a tremendous financial burden on defendant, who, under the circumstances, was justified in concluding that its old rental was being accepted. '. . . a party to a contract may by conduct or representation waive the performance of a condition thereof or be held

35

estopped by such conduct or representations to deny that he has waived such performance.' " (*Id.* at pp. 878-879.)

"The failure of a court to explain the factual and legal basis for its decision on a principal controverted issue, when properly requested by a party, is '. . . error of a most serious, prejudicial, and reversible nature. . . ,  provided ' "that there was evidence introduced as to such issue and the evidence was sufficient to sustain a finding in favor of the party complaining." ' " (*McCurter v. Older* (1985) 173 Cal.App.3d 582, 593-594.)[7]

The trial court did not address estoppel even though it was clearly a theory that Ross relied upon, and repeatedly asked that the trial court rule on.  Ross objected to the statement of decision specifically on the ground that the trial court failed to address estoppel and the only reference to a ruling is that the trial court "overruled" the objection but provided no other explanation.

"Generally, the determination of either waiver or estoppel is a question of fact, and the trier of fact's finding is binding on the appellate court." (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319.)  "When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling." (*Ibid*.)  This court can make a determination on

---

[7] *McCurter* was disapproved of in *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1137.  The *Arceneaux* court found to the extent that *McCurter* held that "a party who fails to bring to the attention of the trial court an omission or ambiguity in its statement of decision may nevertheless avoid the presumptions in favor of the judgment, they are disapproved." (*Arceneaux*, at p. 1137.)  Here, Ross repeatedly objected to the failure of the trial court to provide in its statement of decision a finding on estoppel.

estoppel on appeal.  We conclude that Waring Plaza is estopped from seeking Minimum Rent for the period of February 2011 through July 2019.[8]

Here, on December 24, 2008, Ross sent a letter to Charles advising "[t]his letter shall serve as notice that the provisions for Co-Tenancy were not met pursuant to Section 1.8 of the Lease with the closing of Mervyn's on November 29, 2008."  Ross advised Charles that under section 7.2 of the Lease, this was a ROP and it was going to only pay two percent of monthly gross sales each month during the ROP.  From December 2008 until December 2009, Ross paid this rent with no objection from Waring Plaza.  Each time Ross made its monthly payment, it provided the breakdown of the monthly gross sales and the two percent being paid as rent.

For the first time in December 2009, Charles sent an email to Ross that it had been a year since Mervyns had left and that it needed to begin paying Minimum Rent.  Rosalinda also stated that Charles asked Ross to pay minimum rent several times.  Charles did not indicate that the two percent of monthly gross sales was an incorrect calculation based on the Lease.  Rather, it appeared that he believed that the ROP rent was effective for only one year after Mervyns left.  Ross did not pay Minimum Rent.  Charles did not serve any notice to quit on Waring Plaza and continued to accept the Substitute Rent.  Waring Plaza admitted that it accepted the rent because there was a significant mortgage that had to be paid and it wanted to keep Ross as a tenant.  Waring Plaza was aware that Ross took the position it only had to pay two percent of monthly

---

[8]  Ross appears to argue that Waring Plaza is estopped from ever seeking Minimum Rent, but we do not so find.

gross sales. Waring Plaza accepted the Substitute Rent and did not take any action to collect the difference or evict Ross. Waring Plaza was aware that Ross was only staying because of the payment of the ROP and did nothing to alert Ross that it would pursue the Minimum Rent. Had Ross been aware, it could have vacated the space.

Ross stayed in the space in reliance on only having to pay the Substitute Rent; otherwise it was not economically feasible. By allowing Ross to continue to pay Substitute Rent, and never filing any legal action to recover Minimum Rent, Waring Plaza's conduct appeared to continue to allow Ross to remain and pay only the Substitute Rent. Although Charles stated in March 2010 that if Ross was planning to stay, it had to pay Minimum Rent, Waring Plaza again never took any action. Further, in January 2010, Ross sent a proposal to Rosalinda that it would be willing to negotiate a modification of the Lease to delete the cotenancy provision in exchange for lower Minimum Rent. Waring Plaza counter-proposed that Ross resume payment of Minimum Rent. No agreement was reached. Ross continued to pay two percent of its monthly gross sales and Waring Plaza accepted it.

Waring Plaza's conduct caused or induced Ross to suffer some disadvantage. Ross relied on its interpretation of the Lease, and the lack of legal action taken by Waring Plaza in twice renewing the Lease. In 2012, the parties discussed amending the Lease to remove the cotenancy provision and Ross would pay a lesser amount in Minimum Rent. Ross expressed it was willing to negotiate; Waring Plaza wanted the full Minimum Rent. On July 10, 2012, Waring Plaza sent an email to Ross stating that it needed confirmation that it would be paying $28,450.33 starting on February 1, 2013. On July 11, 2012, Ross

38

responded that the cotenancy provisions were not being met and that it would not pay the Minimum Rent. Ross exercised its option to renew the Lease on July 15, 2012, and Waring Plaza accepted. This extended the Lease to January 31, 2018. Ross continued to pay two percent of monthly gross sales, no new lease was executed, and Waring Plaza accepted the Substitute Rent.

In October 2014, Waring Plaza served a 10-day notice to quit for failure to pay the October rent in the full amount of the Minimum Rent. The notice stated that "In the event Ross fails or refuses to comply with the enclosed notice, Waring Plaza will commence legal action against Ross." In November 2014, Waring Plaza served another 10-day notice to quit for failure to pay the November rent. The notice also warned of legal action Waring Plaza did not request any arrearages. Waring Plaza never pursued legal action against Ross. Waring Plaza could have immediately filed an unlawful detainer action removing Ross from the Plaza but chose not to file such an action. Waring Plaza admitted this was due to it wanting Ross to continue as a tenant. Ross relied on the failure to proceed with legal action as evidenced by it continuing to pay two percent of monthly gross sales, which it believed it was so entitled, and by staying in the space. Waring Plaza by its inaction caused Ross to stay in the premises. It is unjust for Waring Plaza to contend it is entitled to Minimum Rent for this time period (starting in 2011) when it never pursued the payment of Minimum Rent and Ross renewed the Lease with the understanding that it could pay two percent of the monthly gross sales.

In 2015, Waring Plaza finally filed a suit for breach of contract against Ross. However, it did not include that the Lease did not provide for the payment of two percent

39

of monthly gross sales.  The first amended complaint alleged that the Lease provided "if a [ROP] occurred at any time following commencement of the term, the Lease provided for payment of the lesser of the Minimum Rent/monthly rent or Percentage Rent (2 percent of the monthly gross sales of the Ross store)."  It alleged that the Percentage Rent was a penalty as it was not related to any loss or damage that Ross may suffer as a result of the ROP.  It sought declaratory relief, that allowing Ross to pay two percent of monthly gross sales was an unenforceable penalty.  The second amended complaint filed on August 25, 2015, also referred to the Lease providing for a payment of two percent of gross monthly sales.

Thereafter, on June 6, 2017, Ross exercised its option to extend the Lease to January 31, 2023.  According to the Lease, the option could only be exercised if Ross was not in default.  Section 6.1 referred to the option periods in the Lease:  "Provided Tenant is not in default at the time of the exercise of the options herein granted, Tenant may extend the original term of this Lease for the number of separate, consecutive, additional periods of five (5) years each which are specified in Section 1.6, on the terms and conditions set forth herein."

Waring Plaza allowed Ross to exercise its option in June 2017 despite the lawsuit being filed.  As such, it represented by the terms of the Lease that Ross was not in default.  Ross continued to pay Substitute Rent and Waring Plaza continued to accept it and did not pursue any eviction proceedings.

Here, Waring Plaza's acceptance of the Substitute Rent, without taking any legal action, which induced Ross to twice extend the Lease, and then seeking after the 10 years to receive the Minimum Rent for that time period, caused harm to Ross justifying "the intervention of equity." "Equitable estoppel has been applied in a broader context, where the party to be estopped has engaged in inequitable conduct, induced another party to suffer a disadvantage, and then sought to exploit the disadvantage." (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 162.) Waring Plaza continued to accept the Substitute Rent, twice agreed to the extension of the Lease by Ross despite what would constitute a default under the Lease, and then decided after 10 years that it wanted the full Minimum Rent paid by Ross. It did so because it did not want to lose Ross as a tenant and owed on its mortgage. Ross presented evidence that it extended the Lease on the understanding it would only have to pay Substitute Rent. By failing to take any legal action against Ross, Waring Plaza induced Ross to continue the Lease to its detriment. The facts are undisputed. We conclude that estoppel applies, which bars Waring Plaza from seeking Minimum Rent for the period awarded by the trial court.

Ross reasonably relied on the fact that Waring Plaza accepted the Substitute Rent for years and in twice exercising its option to extend the Lease. Waring Plaza admitted it continued to accept Ross's Substitute Rent because it could not afford to lose Ross as a tenant; not because it intentionally waived its right to the Minimum Rent. However, Waring Plaza by its lack of action against Ross allowed Ross to renew the Lease two times, understanding that Ross believed it only owed two percent of monthly gross sales. It is unjust to require Ross to pay the Minimum Rent during the two extended Lease

41

periods[9] as Waring Plaza accepted the Substitute Rent, knew Ross was extending the Lease only because it was able to pay ROP rent, and then after years of not pursuing legal action, filed its lawsuit seeking the entirety of the Minimum Rent. Waring Plaza is estopped from raising the claim during the two Lease extension periods that Ross owed Minimum Rent.

Since we conclude that Ross does not owe the Minimum Rent, we reverse the award of damages in the amount of $1,859,522.86 in rent, plus $10,349.10 in late penalties, and $719,377.31 in prejudgment interest. We also reverse the award of costs and attorney fees awarded to Waring Plaza. The parties are to bear their own costs and attorney fees as, although we conclude that the Lease requires the Minimum Rent be paid by Ross during the ROP based on the excising of section 7.2 (b) from the Lease, it was estopped from receiving such Minimum Rent during the time period awarded by the trial court because it induced Ross to stay in the premises.[10]

---

[9] We note that the second option period expires on January 31, 2023. We express no opinion as to what action could be taken under the Lease for the period commencing in 2019 until the expiration of the Lease as that issue is not before this court.

[10] Our opinion as to estoppel only goes to the award of damages, interest, attorneys fees and costs in this case, which covered the period of 2011 through 2019. We need not address whether PGA was a comparable tenant as the Lease provides only for a payment of Minimum Rent by Ross.

## DISPOSITION

We reverse the judgment awarding damages, interest and attorneys fees, and costs to Waring Plaza.  The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                    J.

We concur:

RAMIREZ _____
                                    P. J.

CODRINGTON _____
                                    J.